[Cite as *State v. Barrow*, 2018-Ohio-1703.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-160378<br>TRIAL NO. B-1400664-B |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| ANTHONY BARROW, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  May 2, 2018

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Melynda Machol*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Jeffrey Brandt,* for Defendant-Appellant.

**DETERS, Judge.**

{¶1}    Defendant-appellant Anthony Barrow appeals his kidnapping conviction. He assigns as error the trial court's admission of evidence, its failure to grant his motion for a mistrial for an alleged *Brady* violation, the sufficiency and weight of the evidence supporting his conviction, and the trial court's and his counsel's handling of a claimed conflict of interest near the end of the trial.  Finding none of his assigned errors meritorious, we affirm the trial court's judgment.

### *Evidence Adduced at the Jury Trial*

{¶2}    Barrow and codefendants Andre Buck, Lonnie Rucker, and Timothy Watson were indicted for multiple offenses in connection with the kidnapping of Tyrell George.   Barrow was charged with one count of kidnapping in violation of R.C. 2905.01(A)(1), and two counts of having a weapon while under a disability in violation of R.C. 2923.13(A)(2) and (3).  The kidnapping count carried one- and three-year firearm specifications and a repeat-violent-offender ("RVO") specification.   Barrow and Buck were tried together before a jury.  The evidence adduced at their trial was summarized in *State v. Buck*, Hamilton App. No. C-160320, 2017-Ohio-8242, ¶ 29-33:

> At the jury trial, the state presented the testimony of Tyrell George, his brother, Timothy Kellam, codefendant Lonnie Rucker, a telephone-records custodian, forensic specialists, and multiple investigators, including Detective [William] Hilbert and Officer [Timothy] Bley, in addition to numerous exhibits.
>
> Telephone records revealed that on the morning of February 6, 2014, Buck and his codefendant Anthony Barrow communicated about 20 times and in one text, Buck had asked Barrow, "Babysitter still on dek?"   The term babysitter referred to a person who watched over a

2

kidnapped victim to make sure he would not escape, while other kidnappers secured ransom money.

Later that day, Barrow called George on the pretense of wanting to buy marijuana. George did not know Barrow, but Barrow convinced him that he had bought marijuana from George before. The two exchanged calls and agreed to meet. When George met up with Barrow, he got into Barrow's van, where he was assaulted by Barrow and a second man. The men bound George with duct tape, wiped his clothing and neck with bleach, and then drove away.

George was moved into a second van where two more kidnappers, Timothy Watson and Lonnie Rucker, "babysat" him through the night and into the next day.

Rucker testified that Watson had contacted him on February 6th about being a babysitter. That night, Rucker picked up Watson and drove to a spot where a person was tied up in the back of a van. Watson said they had to sit and watch the victim until the other kidnappers came back with the money.

{¶3}     During this same time, George's mother, after learning from Kellam that George had been kidnapped for ransom, had contacted the police. Uniformed officers escorted Kellam to the police station where he worked with the police, particularly Detective Hilbert, by communicating with the kidnappers and arranging two ransom drops in an effort to locate and secure George's safe return. When these ransom drops proved unsuccessful, Detective Hilbert became more and more concerned for George's safety.

{¶4}     As we stated in *Buck*, Hamilton App. No. C-160320, 2017-Ohio-8242, ¶ 35-47:

* * * [T]he police were ultimately able to locate Buck and a phone that had been used to make ransom calls.  At trial, Officer Bley clarified that Buck's phone was recovered from Buck's pocket.

Buck was arrested at about 9:30 a.m., on the 7th, but the police still had no idea where George was.

Within hours of Buck's arrest, Watson and Rucker were frustrated that the ransom had not been paid and were concerned that Kellam had gone to the police.  So they left the area, leaving George alone in the van.

At about 2:00 p.m., George escaped from the van and ran to a nearby home.  The occupant called the police who responded, and the police brought George to the homicide unit. The police recovered pieces of duct tape from George's socks, noted bleach stains on his clothing, and photographed abrasions on his wrists, caused by the duct tape.

Police recovered the van that George had escaped from.  In the van, they found duct tape, pieces of mail addressed to Barrow, and Barrow's and Watson's fingerprints.

Telephone records revealed that Kellam had received about 45 ransom calls from two different telephone numbers, (513) 498-2051 and a second number that Barrow admitted was his.

A Cincinnati Bell representative, Paula Papke, testified that the "IMEI, which is basically the serial number for the phone, which would be contained within the phone itself" for Buck's cell phone matched the IMEI listed in the subscriber record for (513) 498-2051, a prepaid

account. She said that subscribers who use prepaid accounts usually provide fictitious personal information when setting up the account. Prepaid-account subscribers have to provide a date of birth as the password for the account, and, without the password, a subscriber cannot access the account. Papke said that many pre-paid account subscribers provide a date of birth that is a single digit off from their actual birthdate. She said that the number (513) 498-2051 was subscribed in the name "Tone Montrell," and that the account password was "11/2/76." Buck's date of birth is November 2, 1977.

Telephone records confirmed that Buck and Barrow communicated with each other and with Kellam and Watson through the evening of the 6th and the morning of the 7th. In addition, the records confirmed that Buck's cell phone "pinged" off cell towers at times and locations that corresponded to those of George's abduction, the kidnappers' movements, and the officer's arrival at his apartment.

In recorded telephone calls from the jail, Buck complained to his mother that his live-in girlfriend had been talking to people about the case, specifically about his cell phone, an important part of the case against him, according to Buck. Buck also angrily confronted his girlfriend about her disclosing the fact that he had purchased his cell phone from her son when she was well aware that "this whole case [is] surrounded by a cell phone."

Barrow testified in his defense that George was a friend of his. According to Barrow, George's brothers were known to be "[i]nto the high-end drug trade." George hatched an extortion plan with Barrow,

Watson, and [others] to get $100,000 from George's brother. George was to receive $40,000.

Barrow said that George got into his van voluntarily and that they drove around. At one point, Barrow said, they sat at the Shell station to see if George's brother would come with the money. At that point, they realized that the police might be involved, so Barrow left the group. He did not know where George went.

Barrow testified that he knew Buck, but that Buck was not involved in the kidnapping. He said that he had spoken to several people "through that Buck phone," one of them being Buck.

Buck did not testify at trial.

### Verdict and Sentence

{¶5} The jury found Barrow guilty of kidnapping, but it acquitted him of the accompanying firearm specifications and the two counts of having a weapon under a disability. Barrow elected to have the trial court determine the RVO specification, and the court found Barrow guilty of that specification. It sentenced Barrow to 11 years in prison for the kidnapping offense and six years for the RVO specification. It ordered the terms be served consecutively to each other and to a four-year prison term in the case numbered B-0803674, for an aggregate sentence of 21 years in prison.

### Other-Acts Evidence

{¶6} In his first assignment of error, Barrow argues that the trial court erred by admitting evidence of two police investigations of Barrow for kidnapping and Barrow's prior kidnapping conviction, because the evidence was inadmissible evidence of his bad character to show action in conformity therewith. Further,

6

Barrow argues that even if the evidence was admissible, the unfair prejudice substantially outweighed any probative value and it should have been excluded.

{¶7}     The trial court's decision to admit evidence rests within its broad discretion and is reviewed under an abuse-of-discretion standard. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 19.  Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  R.C. 2945.59 contains a similar provision.  The evidence, even though offered for an admissible purpose, must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."  Evid.R. 403(A).

{¶8}     Prior to trial, the state filed a notice that it intended, pursuant to Evid.R. 404(B), to use evidence of Barrow's involvement in and conviction for another kidnapping.  At trial, the state sought to introduce this evidence through testimony by Sergeant Howard Grant.  Just prior to Grant's testimony, defense counsel asked for a sidebar conference. He requested that the trial court provide a limiting instruction.  The trial court stated that it would give a limiting instruction that the state was offering the testimony to show modus operandi and identity, to show that Barrow's actions were purposeful, and that Barrow's involvement was not part of a scheme with George.

{¶9}     Grant then testified that he became aware that police were investigating an ongoing kidnapping and were concerned for the victim's safety.  He informed Detective Hilbert, the investigating officer, that six to seven months earlier

7

he had investigated two kidnappings that were similar to the one Detective Hilbert was investigating. At that point, the trial court, at the state's request, gave the jury the following limiting instruction:

> Evidence is about to be received about the commission of crimes or other acts other than the offense with which the defendant, Mr. Barrow, is charged in this trial. That evidence is being received only for a limited purpose. It is not received and you may not consider it to prove the character of the defendant in order to show that he acted in conformity with that character. If you find that the evidence of other crimes or acts is true and that the defendant, Mr. Barrow, committed them you may consider that evidence only for the purposes of deciding whether it proves the defendant's motive, intent, or purpose, preparation or plan to commit the offenses charged in this trial and also the identity of Mr. Barrow as well as the fact that he was not part of a plan or scheme involving -- with Mr. George.

{¶10} Sergeant Grant testified that in 2013 and 2014, he had investigated two kidnappings two weeks apart where an individual had been kidnapped and held for a large ransom. Barrow's counsel then asked to approach the bench. Defense counsel objected, arguing that Barrow had been investigated for two kidnapping incidents, but charged for only one of them. The court stated that the limiting instruction sufficiently covered these acts as well as any conviction, that the assistant prosecuting attorney would clarify that Barrow had been charged in connection with only one investigation, and that the defense counsel would have the opportunity to clarify that on cross-examination.

{¶11} Following the sidebar conference, Sergeant Grant testified that he had been investigating two kidnappings where the kidnapped individuals had relatives who were known participants in the drug trade and carried large sums of money. The kidnappers would make phone contact with the victim, lure the victim to a location, throw the victim into a van, and then drive to another location to bind the victim. The kidnappers would then contact the victim's family, threatening to kill the victim or his or her family members if they did not pay the ransom. Sergeant Grant testified that Barrow had been a suspect in both kidnapping investigations. He had been charged in connection with one of these kidnappings and he had pleaded guilty to kidnapping.

{¶12} Here, evidence of the first police investigation of Barrow and his prior kidnapping conviction was relevant and was admitted for proper purposes under Evid.R. 404(B). Barrow's defense at trial was that he did not lure George into his van and hold him for ransom, but that George had solicited Barrow to stage his own kidnapping to extort money from his family. Thus, Barrow placed his motive, plan, and intent at issue in the trial.

{¶13} Sergeant Grant's testimony was admissible to prove Barrow's motive and intent when he lured George into the van and held him for ransom. *See State v. Johnson*, 2d Dist. Montgomery No. 23508, 2011-Ohio-1133, ¶ 55. Evidence that Barrow had engaged in an identical kidnapping scheme six to seven months earlier tended to disprove Barrow's assertion that the kidnapping was a ruse. Thus, the trial court did not err by admitting the evidence.

{¶14} While Barrow claims that the trial court's limiting instruction to the jury was not effective to correct any prejudice stemming from Sergeant Grant's testimony, he points to no specific instance of prejudice. The jury is presumed to follow the

instructions, including curative instructions, given to it by the trial court judge. *State v. Loza*, 71 Ohio St.3d 61, 75, 641 N.E.2d 1082 (1994). The trial court, erred, however, in permitting Sergeant Grant to testify about the second kidnapping investigation where Barrow had been a suspect, but had not been charged with a crime. But error, if any, was harmless on this record. The state's evidence against Barrow was overwhelming. We, therefore, overrule the first assignment of error.

### *Motion for New Trial - Alleged Brady Violation*

{¶15} In his second assignment of error, Barrow argues that "the trial court erred [by] denying his motion for a mistrial as a result of the state's *Brady* violation — its failure to notify Barrow before trial of the existence of a second interview of George."

{¶16} The grant or denial of a mistrial is within the sound discretion of the trial court. *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). A mistrial is warranted only when a fair trial is no longer possible. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001).

{¶17} Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the state has a duty to disclose to a criminal accused evidence material to the accused's guilt or innocence under the fair-trial guarantee of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *State v. Hunter*, 1st Dist. Hamilton No. C-090569, 2012-Ohio-2859, ¶ 12. Undisclosed evidence is "material" only if there is a "reasonable probability" that its disclosure would have changed the outcome of the trial. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The probability-determination entails an inquiry not into whether a trial with the undisclosed evidence would have yielded a different verdict, but whether the evidence "considered collectively" could reasonably be taken

to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 434-436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The *Brady* requirements apply to both exculpatory evidence and to evidence used to impeach a witness's credibility. *Bagley* at 676; *State v. Cook*, 1st Dist. Hamilton No. C-140118, 2014-Ohio-4900, ¶ 11.

{¶18} During codefendant Buck's cross-examination of Detective Hilbert, Buck's counsel asked Detective Hilbert if he was surprised that George had testified at trial that he had met Barrow to sell him marijuana when he had not mentioned the marijuana sale during his February 7, 2014 interview. Detective Hilbert testified that he was not surprised, because he had learned of the marijuana sale when he had interviewed George ten-15 days after the February 7, 2014 interview. Detective Hilbert further testified that he had noticed that Barrow's phone records had some calls and text messages between Barrow and George prior to the kidnapping. Detective Hilbert had then met with George to ask him about these contacts. George had then told him that he had met with Barrow to sell him marijuana. Hilbert further testified that George's second statement had been consistent with his trial testimony.

{¶19} At that point, Barrow's counsel interrupted and asked to approach the bench. Barrow's counsel told the court that he was unaware Detective Hilbert had interviewed George a second time, or if he had been made aware, he did not recall it. He told the court he had spoken with Detective Hilbert and he could not remember a subsequent interview. Barrow's counsel expressed concern that the interview may have changed his approach.

{¶20} The assistant prosecuting attorney stated that he had given this information to Buck's and Barrow's counsel, but that they had been represented by

several attorneys. The assistant prosecutor stated that his case file was voluminous and he could not recall if he had specifically relayed this information to Buck's or Barrow's current counsel, but he had asked Detective Hilbert to give them as much information as they needed.

{¶21} The trial court stated that there was no evidence that the prosecutor had withheld this information from defense counsel. It suggested that Buck's counsel finish his cross-examination of Detective Hilbert. The court would then give Buck's and Barrow's counsel an opportunity to talk to Detective Hilbert outside the presence of the jury to discover if there was any new material related to Detective Hilbert's second interview of George.

{¶22} Buck's counsel stated that he had no issue with Detective Hilbert or the prosecuting attorney. Instead, his issue was with George who had testified that he had told Detective Hilbert in his February 7, 2014 interview that he had met Barrow to sell him marijuana, when this information was not in his original statement. Buck's counsel told the court that he had covered this inconsistency during his cross-examination of Detective Hilbert.

{¶23} The next day, following defense counsels' off-the-record discussion with Detective Hilbert, the trial court stated on the record that Detective Hilbert's second interview with George had covered only the discrepancies between George's February 7, 2014 statement and his and Barrow's phone records and had not addressed any additional information. George had acknowledged during this second interview that he had met Barrow to sell him marijuana.

{¶24} Buck's counsel resumed his cross-examination of Detective Hilbert. Barrow's counsel then cross-examined Detective Hilbert extensively about his second interview with George, the inconsistencies between George's first and second

statements, and his failure to testify at trial consistently with his first statement. Barrow's counsel additionally questioned Detective Hilbert about his disclosure of this second statement to counsel, and Hilbert's failure to mention the second interview in his testimony at the hearing on codefendant Buck's motion to suppress.

{¶25} At the close of the state's case, Barrow's counsel moved for a mistrial on the basis that he had believed that the police had interviewed George only one time, and that Barrow had been prejudiced as a result of the state's failure to turn over the information to him about a second interview. The trial court denied the motion for a mistrial on the basis that it had given defense counsel an opportunity to question Detective Hilbert about the content of the second interview and to extensively cross-examine Detective Hilbert about his disclosure of the statement and its impact on George's trial testimony.

{¶26} Here, there is no reasonable probability that the outcome of the trial would have been different had George's second statement been disclosed to Barrow's counsel prior to trial. While George's second statement differed from his original statement to police, it was consistent with his trial testimony. At trial, Barrow's counsel attacked George's credibility by pointing out that in his statement to police he had failed to mention Barrow had contacted him to purchase marijuana. While defense counsel may have been able to further attack George's credibility by pointing out the difference between his first and second statements, any alleged failure by the state to provide Barrow's counsel this evidence was not material. Barrow's counsel additionally had the opportunity to question Detective Hilbert about the content of the second interview and to extensively cross-examine Detective Hilbert about his disclosure of George's second statement and its impact on George's trial testimony.

{¶27} The state, moreover, had other evidence besides George's testimony that directly linked Barrow to the kidnapping. The state presented Rucker's testimony as the "babysitter," Detective Hilbert's testimony about the phone calls he overhead, and the physical evidence, which included the telephone records, that all supported the kidnapping charge. *See Harris v. Lafler,* 553 F.3d 1028, 1034 (6th Cir.2009) (noting that "considerable authority * * * indicates that a defendant suffers prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of one witness"). As a result, the trial court did not abuse its discretion by overruling his motion for mistrial. We, therefore, overrule Barrow's second assignment of error.

### *Sufficiency and Manifest Weight of the Evidence*

{¶28} In his third and fourth assignments of error, Barrow argues his kidnapping conviction was based on insufficient evidence and was against the manifest weight of the evidence.

{¶29} To reverse a conviction for insufficient evidence, the reviewing court must be persuaded, after viewing the evidence in the light most favorable to the state, that no rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). To reverse a conviction as against the manifest weight of the evidence, the reviewing court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and conclude that in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Id.* at 387.

{¶30} The state argued that Barrow was guilty as either a principal in or a complicitor to George's kidnapping. Complicity is where a person "acting with the

14

kind of culpability required for the commission of an offense * * * aid[s] or abets another in committing the offense." R.C. 2923.03(A)(2). To support a conviction for complicity by aiding and abetting, the state must show that the defendant assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime and that the defendant shared in the criminal intent of the principal. *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus. Aiding and abetting can be inferred by presence, companionship, and conduct before and after the offense is committed. *Id.* at 245.

{¶31} Barrow was convicted of kidnapping pursuant to R.C. 2905.01(A)(1), which provides that "[n]o person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person" for the purpose of holding him "for ransom or as a shield or hostage." Barrow contends the state failed to present any evidence that he had "purposely by force, threat or deception, removed" George. We disagree.

{¶32} George testified that Barrow had contacted him the day of the kidnapping under the pretense of purchasing marijuana from him and they had arranged a meeting. After some coaxing from Barrow, George got into Barrow's van to sell Barrow marijuana. Barrow and another man immediately began assaulting George from behind. As George struggled to escape, Barrow threatened to shoot him. Afraid for his life, George stopped struggling. The two men then bound George with duct tape and rope, wiped his neck and clothing with bleach, and drove away. George was then held for ransom until the following afternoon when he was able to escape.

{¶33} Telephone records and testimony from Kellam, Detective Hilbert, and Rucker established that shortly thereafter Buck and other unidentified men called

15

Kellam demanding money and threatening to kill George if Kellam did not pay. Ransom drops were attempted at two separate locations. Telephone records and text messages detailed communications between Barrow, Buck, Watson, and Rucker. Rucker testified that he and Watson had "babysat" George, that George had been scared for his life, and that George had kept asking Rucker if he was going to let him go. When viewed in the light most favorable to the prosecution, this evidence could have convinced a rational trier of fact that Barrow had acted as a principal or in concert with codefendants Buck, Watson, and Rucker to purposely by force, threat, or deception remove George from the place where he was found or restrain him of his liberty for the purpose of holding him for ransom. *See Buck,* Hamilton App. No. C-160320, 2017-Ohio-8242, at ¶ 28-49; *Thompkins,* 78 Ohio St.3d at 386, 678 N.E.2d 541.

{¶34} Barrow next argues that his conviction is against the manifest weight of the evidence. He argues the jury lost its way in concluding that he had kidnapped George for ransom. While Barrow testified at trial that he and George had devised a plan with Watson and others to extort $100,000 from Kellam and that George was to receive $40,000 of the ransom money, the jury, as the trier of fact, was in the best position to judge the credibility of the witnesses. *See State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus; *State v. Antill,* 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). After reviewing the record, we cannot conclude the jury lost its way and created a manifest miscarriage of justice by choosing to accord more weight to the testimony of the state's witnesses than to Barrow's and convicting Barrow of kidnapping George. *See Thompkins* at 386. We, therefore, overrule the third and fourth assignments of error.

## Conflict of Interest

{¶35} In his fifth assignment of error, Barrow contends "the trial court erred by failing to hold a hearing as a result of news of a possible conflict of interest, and trial counsel was ineffective in failing to object."

{¶36} A criminal defendant's Sixth Amendment right to the effective assistance of counsel encompasses both the right to competent representation and the right to representation that is free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); *Glasser v. United States*, 315 U.S. 60, 70, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Conflicts of interest can arise from defense counsel's joint or successive representation. *Jalowiec v. Bradshaw*, 657 F.3d 293, 315 (6th Cir.2011). "Successive representation occurs where defense counsel has previously represented a co-defendant or trial witness." *Moss v. United States*, 323 F.3d 445, 459 (6th Cir.2003).

{¶37} A defendant who claims he was denied the right to conflict-free counsel must demonstrate that "an actual conflict of interest" adversely affected his lawyer's performance. *Wood* at 273; *Moss* at 459-460. "A possible conflict is insufficient." *State v. Getsy*, 84 Ohio St.3d 180, 187, 702 N.E.2d 866 (1998).

{¶38} An "actual conflict of interest," for purposes of the Sixth Amendment, is "a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002), fn. 5. To prove an "actual conflict of interest," the defendant must show that his counsel "actively represented conflicting interests," and that the conflict "actually affected the adequacy of his representation." *Id.*, quoting *Cuyler v. Sullivan*, 446 U.S. 335, 349-350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

17

{¶39} Before closing arguments on the tenth day of trial, Buck's counsel informed the court that Buck had just told him that Barrow's counsel had represented him in 2007. Barrow's counsel told the court that he had researched the 2007 matter and found another attorney's name listed. Given his heavy case load, however, he could not specifically recall if he had represented Buck.

{¶40} The trial court expressed its skepticism of any conflict by stating that the trial was in its second week, Barrow's counsel had been representing him for some time, and there had been earlier court settings where Buck could have raised the claimed conflict. The court pointed out that Barrow had testified that Buck had nothing to do with the charged offenses, and that Barrow's counsel had done nothing to try to incriminate Buck. Buck responded by stating that he had not realized earlier that there was a potential conflict. Barrow did not object or express any concern.

{¶41} Barrow argues on appeal that the trial court erred by failing to inquire further into this alleged conflict of interest. He argues that once the trial court learned that Barrow's counsel had represented Buck in the prior unrelated criminal matter, the court should have questioned Barrow's counsel about whether he had given Barrow advice or had questioned certain witnesses in order to favor Buck rather than to assist Barrow. Barrow further asserts that because his testimony exonerated Buck, the trial court was required to investigate whether his counsel had urged him to testify because this advice would have reflected an actual conflict of interest.

{¶42} Prior to Barrow's testimony, Barrow's counsel had informed the trial court outside of the presence of the jury that Barrow had decided to testify against counsel's advice. Absent evidence that Barrow's counsel's basic strategic decisions were influenced by his representation of Buck nine years earlier in an unrelated

matter, the trial court had no duty to make further inquiries into the existence of a conflict of interest. *State v. Tucker*, 1st Dist. Hamilton No. C-020821, 2003-Ohio-6056, ¶ 30; *State v. Dillon*, 74 Ohio St.3d 166, 169, 657 N.E.2d 273 (1995) (holding the trial court had no duty to inquire into a conflict of interest where no possibility of conflict existed given the facts known to the trial court). Nor can we conclude that Barrow's counsel was ineffective for failing to object or make further argument relating to the alleged conflict of interest. We, therefore, overrule Barrow's fifth assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**MYERS, P.J.,** and **MILLER, J.,** concur.

Please note:

The court has recorded its own entry this date.