*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

V

MYRON DAVIS,

        Defendant-Appellant.

UNPUBLISHED
May 22, 2026
8:41 AM

No. 364034
Wayne Circuit Court
LC No. 16-008385-01-FC

Before: LETICA, P.J., and GARRETT and FEENEY, JJ.

LETICA, P.J. (*concurring in part and dissenting in part*).

I agree that defendant Myron Davis is entitled to relief on his motion for relief from judgment. I also agree with the trial court's conclusion that Davis failed to establish that there was a "secret agreement" for Quinetell Ray's trial testimony in Davis's case. Instead, Davis established that Ray's plea deal was an undisclosed reward for his past cooperation in Davis's case. Combined with a *Brady*[1] violation or ineffective assistance of trial counsel and appellate counsel, Davis is entitled to relief.

## I. FACTUAL BACKGROUND

## A. THE MURDER

Davis and Glynn Stephenson, also known as "Bay Boy," had been friends for twenty years. The two had a falling out after Davis blamed Stephenson for Davis being involved in a gun incident, resulting in Davis's return to prison. Additionally, Stephenson had engaged in a sexual relationship with Davis's girlfriend.

On January 27, 2016, Davis was paroled and wore a tether for 90 days. About three months later, on Thursday, July 28, 2016, a call was made to 911 at 10:12 p.m., reporting that a man had been shot four or five times and was likely dead in the area of Norfolk and Cherrylawn Streets.

---

[1] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

Detroit Police Department (DPD) officers arrived to find Stephenson's body in the street. Stephenson had been shot five times—once in his leg and thigh, twice in his left ankle, and fatally, from close range, in the face.

The police investigated and learned that a number of people had gathered to hang out in a park. Stephenson arrived with Ray, also known as "Q."

Kevin Martin, known as "Black Kevin," was also in the park. After Stephenson arrived, Martin texted Davis: "Dog out here." During a subsequent phone conversation with Martin, Davis received confirmation that Stephenson was in the park.

Davis soon arrived at the park, walking up to Stephenson while yelling his name. Ray testified that Davis had a firearm in his pocket. A physical altercation ensued between Davis and Stephenson. Davis pulled out his gun and shot at Stephenson several times, pausing between shots that hit Stephenson in the leg and ankle. Davis began to walk away as Stephenson attempted to crawl to safety. As Stephenson begged Ray to help him, Stephenson cursed Davis, who returned, shot Stephenson in the face, and then fled.

Hours after the murder, the police arrested Davis during a traffic stop. The car he was driving was released to Davis's passenger. Within 30 minutes of Davis's arrest, a police officer went to the passenger's home to retrieve Davis's cell phone. After asking the passenger for the phone, the officer heard a noise. When the phone was provided to the officer, it had a cracked screen with glass particles falling from it. Although the phone number was affiliated with Davis, he repeatedly denied having a cell phone during his police interview. Eventually, however, Davis explained that the phone was a work phone, which was shared with other people. Davis specifically denied having the work phone in his possession on the day of the murder. At trial, an expert testified that Davis's "work" phone was in the area of the murder at the relevant time and not in the area where Davis claimed to be.

A medical examiner testified that Stephenson died from multiple gunshot wounds. DNA from two donors was found under Stephenson's right-hand fingernails. An expert testified that Stephenson was one of the contributors. For the second donor, it was 760 billion times more likely that it was Davis's DNA, from Davis's blood, not his skin cells, than the DNA of another unknown individual.

## B. DAVIS'S FIRST APPEAL

After a jury convicted Davis of second-degree murder, MCL 750.317, carrying a concealed weapon, MCL 750.227, felon-in-possession of a firearm, MCL 750.227f, and felon-in-possession of ammunition, MCL 750.227f, he filed a claim of appeal in this Court. He argued that: (1) he was denied the right to appellate review due to problems with the transcription of his trial after the court reporter's equipment malfunctioned during Martin's trial testimony (near the end of direct examination and all of cross-examination) and the prosecutor's closing rebuttal argument, (2) prosecutorial misconduct by (a) knowingly presenting perjured testimony from Martin and (b) commenting on the veracity of Martin's testimony during closing, and (3) ineffective assistance of trial counsel for failing to object to the alleged prosecutorial misconduct. This Court affirmed. *People v Davis*, unpublished per curiam opinion of the Court of Appeals, issued May 16, 2019

(Docket No. 338112). Our Supreme Court denied Davis's application for leave to appeal. *People v Davis*, 504 Mich 999; 934 NW2d 252 (2019).

## C. DAVIS'S MOTION FOR RELIEF FROM JUDGMENT

In 2021, Davis filed a motion for relief from judgment under MCR 6.500 and requested an evidentiary hearing. Davis argued: (1) the prosecution elicited perjured testimony from Ray about the terms of his plea in a separate criminal case, (2) the prosecutor violated MCR 6.201(B)(5) by failing to turn over evidence of Ray's plea agreement or any other agreement for testimony in connection with this case to Davis's trial counsel, (3) the police violated Davis's Fourth Amendment rights when they seized his cell phone without a search warrant, (4) appellate counsel was ineffective for failing to order and review Ray's calendar conference, plea, and the sentencing transcripts from Ray's separate criminal case and raise the issue of Ray's "deal" to testify, (5) appellate counsel was ineffective for failing to raise the issue of "the seizure of the cell phone attributed to" Davis, and (6) counsel was ineffective for failing to request redaction of portions of Davis's video-recorded statement. Davis further alleged that appellate counsel's ineffective assistance satisfied the good cause requirement and that the errors alleged constituted actual prejudice or were so offensive to the maintenance of a sound judicial process that his conviction should not be allowed to stand regardless of its effect on the outcome of the case. See MCR 6.508(D). In Davis's supporting brief, he added that trial and appellate counsel were ineffective for failing to object to erroneous jury instructions on the jurors' use of prior criminal convictions to determine a witness' credibility.

The trial court denied Davis's motion. Davis moved for reconsideration because the court had "inadvertently conflated" Davis's claims pertaining to Ray as involving Martin. Although the record does not reflect that the trial court formally granted Davis's motion for reconsideration, it directed the prosecution to file a response to Davis's motion.

After receiving the prosecution's response, the trial court again denied Davis's motion. It determined that Ray did not commit perjury because he swore under oath at his plea and at trial that "he was not given any special consideration for his concealed weapons[2] guilty plea."[3] The trial court also rejected Davis's discovery violation claim because "review of the trial transcript . . . reveals there was no evidence of any special consideration for witness Ray" and that Davis's "trial counsel was well aware of Quinetell Ray's circumstances, including his probationary status and his criminal history." The court also rejected Davis's Fourth Amendment claim as well as his contentions that trial and appellate counsel were ineffective for failing to seek redaction of his police interview, for failing to object to the jury instructions, and for failing to raise these issues on appeal.

Davis filed a delayed application for leave to appeal to this Court, which was denied. *People v Davis*, unpublished order of the Court of Appeals, entered April 25, 2023 (Docket

---

[2] MCL 750.227.

[3] As discussed *infra*, Ray's guilty plea was to a receiving and concealing stolen property, MCL 750.535(7).

No. 364034).  Davis then appealed to our Supreme Court.  In lieu of granting Davis's application for leave to appeal, the Supreme Court remanded to this Court for consideration as on leave granted.  *People v Davis*, 513 Mich 921; 997 NW2d 215 (2023).

After briefing and oral argument, this Court vacated in part the trial court's June 21, 2022 order denying Davis's motion for relief from judgment and remanded for further proceedings while retaining jurisdiction.  *People v Davis*, unpublished order of the Court of Appeals, entered September 11, 2024 (Docket No. 364034).  Specifically, this Court directed the trial court to conduct an evidentiary hearing to determine "whether Quinetell Ray received a favorable plea agreement in exchange for his testimony in this case, and, if so, the nature and extent of the prosecutor's involvement or knowledge of that agreement."  *Id*.

### D.  THE REMAND HEARING

At the remand hearing, the parties stipulated that Ray was deceased.[4]  The parties also stipulated to the admission of Ray's August 17, 2016, videotaped police interview as well as three transcripts from Ray's 2016 receiving and concealing criminal case.  The parties further stipulated that the Wayne County Prosecutor's Office's (WCPO's) file pertaining to Ray's 2016 case could not be located.

### 1.  RAY'S 2016 POLICE INTERVIEW

After Ray was arrested in a stolen vehicle on August 17, 2016, DPD Sergeant Robert Lalone and Detective Matthew Van Raaphorst interviewed him for about 45 minutes.  The police told Ray they were inquiring about a homicide on Cherrylawn and Norfolk.  They knew that Ray was not involved, but that he was a witness.  Ray eventually said he would not lie to them, admitting that he knew "everything."  Ray, however, was concerned because the killer had committed more than one murder and knew everything about Ray, including where his children and family lived.

Lalone told Ray that it was possible to move Ray's family; however, Ray had to tell them the truth and give them a statement.  Lalone also said that he could not promise Ray "s***."  The police could not make Ray's case go away, but they could talk to the prosecutors and explain what was going on.  Given that someone was killed as juxtaposed with a stolen car, Lalone asked what Ray thought they cared about more.  After Ray recognized that it was the murder, Lalone explained he did not have the authority to let Ray go as soon as he gave them a statement.  Lalone continued:

> What I can do if you tell us what happened and you don't, I mean it is what it is.  Without you, we have nothing.  But you at least gotta put something on paper so that we can go back to the prosecutors and say "Look, my man's in trouble, right now.  What can we do for him?  This is what he's reaching out for us."  Until

---

[4] On June 14, 2024, a reckless driver, whose license was suspended, struck the vehicle that Ray was driving, causing Ray's death. <https://www.waynecountymi.gov/Prosecutor-Press-Releases/2024/Detroit-Man-Charged-in-West-Seven-Mile-Road-Fatal-Car-Crash> (accessed May 21, 2026).

everything is in place, you don't have to do s***.  You're kinda the captain of the boat.

Van Raaphorst added: "[C]ases don't get bigger or more important than homicide cases" and "[t]his is the biggest bat you can swing with right now."

Ray observed that this was not the first time he had been visited by the Homicide Department, but this ran deep.  Ray described how Davis suspected Stephenson had set him up on a gun charge, resulting in Davis going to prison about two years earlier.  After being released, Davis threatened to kill Stephenson, posting threats directed toward Stephenson on Stephenson's "baby mama['s]" Facebook account.  Detective Van Raaphorst was already aware there was a Facebook post where Davis wore a mask and said: "No face.  No case."

According to Ray, on the day of Stephenson's murder, he and Stephenson went back and forth between their respective homes.  Later, they were driving up Cherrylawn when they saw a couple of people at the park.  Ray suggested that they spend time there because they had nothing else planned.  Stephenson agreed and parked in a manner so that people would not know he was there.

The men were talking and having a drink when Ray saw Davis, who had his shirt pulled up over his head.  Ray proposed that Stephenson leave, but Stephenson opined that Davis "ain't about to do s***."  Because Ray saw that Davis had a gun, Ray again encouraged Stephenson to leave, but Stephenson declined.

Davis asked "to holler" at Stephenson who walked over to Davis.  Davis asked whether Stephenson was going to kill him and whether Stephenson had his gun on him.  According to Ray, Stephenson did not have a gun.  After Davis patted Stephenson down, Davis pulled his gun out and began swinging it at Stephenson.

Ray was about to approach, but Davis pointed the gun at him, stating: "Get the f*** down, n*****."  Davis then began "playing" with Stephenson, shooting him three times.

As Stephenson was crawling toward Ray, Stephenson said: "Q, man, this m*********** done shot me, dog.  This b**** . . . shot me."  Davis then turned, asking: "What'd you say, n*****?", before shooting Stephenson in the face.

Ray tried to help Stephenson into the van but failed because Stephenson was too heavy.  Ray explained that this was why it might appear as though Stephenson was moved at the scene.

Lalone asked who else was present.  Ray said there were six people, but he only specifically named Pookie[5] and Black Kevin.  Ray reported: "See they say that Black Kevin called the m***********.  * * * [S]omebody about to kill him."

---

[5]" Pookie" was the nickname for Ronald Branam, Jr.

Ray became very emotional, observing that he would be killed. Ray explained Davis was connected with another person, who was a hitman and had been involved in multiple murders. Ray discussed other incidents and asked if he went along with this whether he had to go to court to testify. Van Raaphorst responded that Ray would if Davis's case went to trial. Ray asked what would stop it from going to trial and was told Davis taking a plea. Thereafter, however, Lalone acknowledged that Davis would receive discovery with Ray's name regardless.

Lalone also told Ray that they were going to write down some notes and pull the files on the cases Ray had discussed with them over the next couple of days. Lalone added that Ray's "charges could very well go bye-bye . . . ."

After Stephenson's murder, Ray said he had gone to a small town in Ohio. Lalone asked whether that was a place Ray could move. Ray did not think so, but he had to get away due to the hitman's online death threats. After further discussion about the hitman, Lalone explained this was not television. He could not make a phone call to free Ray and move him tomorrow. Instead, the police needed to reach out to their federal partners. Ray asked if Lalone thought that Ray was just talking, which Lalone adamantly denied. Even so, the police would not move Ray simply because he said he knew about four murders.

Ray advised that he did not have to tell the police anything. Lalone agreed. Ray said it was his life and asked who would take care of his children if he were killed tomorrow. Lalone retorted that he had never lost a witness. If Lalone asked for a witness to be moved out-of-state, he needed facts. Unlike the county, the federal government had the necessary resources to move witnesses. At that point in the interview, Ray declared that he would not move forward with information about the hitman. And, although Ray later agreed to help the police, he added that he and his kids had to be moved. Lalone again asked if Ray could go to Ohio. Ray declined.

Lalone asked Ray to think about the information pertaining to the hitman. Lalone would reach out to someone he knew in the federal government and explain the situation to see what he had to say. Ray agreed with Lalone, noting that they did not need to move forward regarding the hitman, but that Lalone could explain the options.

Ray later said that he was not "a snitch." Ray discussed situations where the police had tried to have him inform on others and lied to him. Lalone said he would not lie to Ray. Ray repeated that if he helped them he had to go. Lalone asked Ray what the police would have if Ray was killed. Ray responded: "Nothing."

Van Raaphorst noted all Lalone was asking for was that Ray just think about it. Ray responded: "I just told you, I'll roll with you on that, but I gots to go. * * * If I roll with you all, I - you gots to roll with me . . . ."

They then discussed Ray's current charges of stealing a car in Ohio and resisting and obstructing (R and O). Van Raaphorst said:

> So let us talk to the prosecutors tomorrow about your case. * * * Hey, we got, you know, a witness here that's – is locked up; he's cooperating in a homicide, at least one homicide case, you know, what can we do for him?

-6-

Ray explained he was trying to get in contact with his people because the car was not stolen. Lalone offered to look into it, noting that homicide was a separate unit from the unit that dealt with stolen cars. If Lalone's contact advised that nothing could be done about the charge, Lalone would let Ray know. The following exchange then occurred:

> *Lalone*: If you're gonna get charged, I'll call and talk to the prosecutor.
>
> *Ray*: Mm-hmm.
>
> *Lalone*: I know the prosecutor that's in charge of the stolen car section.
>
> *Ray*: Right.
>
> *Lalone*: So . . . .
>
> *Van Raaphorst*: Everything goes through the prosecutors, okay.
>
> *Ray*: I know.
>
> *Lalone*: But, but let me, let's not put the cart in front of the horse. If this is nothing and they're gonna discharge you, then, that's good too, and I'll let you know that.
>
> *Ray*: Mm-hmm.

Van Raaphorst explained that whether Ray was released or went to county jail, they would be getting back in touch with him "one way or another." After Ray said he had a lot of information, this exchange followed:

> *Ray*: So here's what I'm saying. Like listen to me. This is all some for real s***, man. I know a lot of s***, you feel me? Like, if you all help me with this s***, I promise you. You all give me a phone or a little punk ass little contract mini phone or some s***. Man, ah, man, ah, ah, you'll be like, "This m*********** know too much f****** s***."
>
> *Van Raaphorst*: Let's take one step at a time, man.
>
> *Ray*: I'm just telling you, man.

(Van Raaphorst, Lalone, and Ray talking over each other)

> *Lalone*: Let. . . .
>
> *Ray*: Just one step at a time.
>
> *Lalone*: Let me.
>
> *Ray*: No, you all trying to get me.

*Lalone*: No, let me on this. . . .

*Ray*: You feel what I'm saying?

*Van Raaphorst*: Yeah.

*Ray*: You trying to get me to say something . . . .

*Lalone*: No, let us work on this case.

*Ray*: So s***. I might – I might as well help you all the way. . . .

*Lalone*: Let us work.

*Ray*: . . . if you're gonna get me away from the situation.

*Lalone*: Let us work on this first case. Let me work on what you're arrested for now.

*Ray*: Yeah.

*Lalone*: Those are two things I want to work on right now. The other stuff [presumably referencing the information pertaining to the hitman] we're gonna put on a back burner until you feel comfortable, then we'll work on that. Is that fair enough?

*Ray*: All right. Yeah.

*Lalone*: But let's work on the case that you're arrested for and this one.

*Ray*: Mmm.

Thereafter, the police talked to Ray about identifying Davis in a photographic lineup. Ray asked whether they were going to show his identification to Davis. Van Raaphorst assured him that they would not until they got to that point at the trial. Lalone interjected:

So listen. None of – Nothing we do. We can't bring anything in without you. So, if you tell us to get f****** when we walk out of the room. That's where it ends. You understand that?

*Ray*: Yeah.

*Lalone*: I can't bring this into court without you sitting there and them saying "Sir, is this what the officer showed you and did you pick somebody out?" You're, you're in control. Believe it or not. We're not here to f****** okey-doke you. Let me see what we can. * * * Let me see what we can do with this case you're locked up on. First and foremost. That'll be my first favor to you. And I can't, I cannot promise. . . .

-8-

*Ray*: Promise. . . .

*Lalone*: . . . you anything.

*Ray:* I know you can't.

*Lalone*: 'Cause I don't want to coming back and saying "Lalone I got charged. What the f***."

*Ray*: Huh. (Inaudible.)

*Lalone*: 'Cuz, I don't know. I don't know. I don't know.

*Ray*: But, shit, if they, if they wants a murder. That m*********** got murdered (inaudible). . . .

*Lalone*: But listen we – we both have enough sense. . . .

*Ray*: Yeah.

*Lalone*: and we've been . . . .

*Ray*: Yeah.

*Lalone*: around long enough to know. But again I refuse to make you promises 'cuz. . . .

*Ray*: You ain't gotta make no promises.

*Lalone*: That ain't my, if I was the Prosecutor's Office, I'd come in here and I can speak with that authority, that's not my, . . . .

*Ray:* Uh. I mean. . . .

*Lalone*: and I don't work the commercial Auto Theft. Ah. Ah.

*Ray*: Hey, hey man, I, I know you ain't making no promises here. I know how to shut up. So if the s*** don't go away. . . .

*Lalone*: Then you just tell me to get f*****.

*Ray*: I'm just not gonna say another word.

*Lalone*: And I can appreciate that and I wouldn't be mad at you for doing it. How about that?

*Ray*: 'Cuz I ain't about to put my, my kids and my life in jeopardy if m*********** can't help me.

*Lalone*:  Is that fair enough?

*Ray*:  (Shook his head affirmatively.)

Ray continued with the process of identifying Davis in a photographic lineup and Lalone told him: "Next time I come talk to you, I'll be able to say this, this, and this.  Hopefully, you'll be out by then."  Ray responded: "Hopefully."  Lalone replied: "So, if you get released, don't forget about us 'cuz I'm gonna make some phone calls."  Ray asked for a telephone contact number.  And Van Raaphorst advised Ray they were not going to arrest Davis, who was already arrested on a parole violation.  Moreover, they would not submit anything or arrest anyone else "without bringing you onboard with us, okay?"

Ray said he knew where the gun was, adding: "It's like three guns there.  And all of them got bodies on them."  Lalone explained there was a way to execute a search warrant for the guns and they could even do it on Ray's word with his name suppressed.

Later, Lalone told Ray: "Hopefully, you're not gonna be here more than a day.  Honestly, I'm, I'm gonna make a phone – as soon as we put you up, I'm gonna make a phone call and we'll go from there."  Van Raaphorst added: "Let's get on that right now."  Lalone replied: "Yup," and Ray's interview ended.

## 2.  RAY'S 2016 RECEIVING AND CONCEALING STOLEN PROPERTY (A MOTOR VEHICLE) AND RESISTING AND OBSTRUCTING CHARGES

The next day, on August 18, 2016, Ray was arraigned on charges that he possessed a stolen car and resisted and obstructed a police officer as a fourth habitual offender, MCL 769.12.  He was bound over on August 25, 2016, and arraigned in circuit court on September 1, 2016.

### a.  RAY'S 2016 CALENDAR CONFERENCE TRANSCRIPT[6]

On September 30, 2016, then Third Circuit Court Judge Michael Hathaway held a calendar conference.  Assistant Prosecuting Attorney (APA) Veronique Tu appeared for the People, standing in for APA Felipe Karian-Torres.  Defense attorney Kristine Longstreet appeared for Ray.

The parties discussed how many witnesses they anticipated calling at trial.  The court offered that it could try to "squeeze" in Ray's trial before the end of year, inquiring whether there was an offer, noting "it's not a huge case, but he's got a lot of priors."

Ray's defense counsel interjected, observing that because there was "no one else in [the] courtroom," she would "speak freely."  The following exchange occurred:

[*Ms. Longstreet*:]  Mr. Ray has provided some information in regards to a homicide.  Um, and Ms. Posigian, Anna Posigian is the prosecutor in that case along with Detective Lalone.  Um, this case is part of the PATU [Prosecutor's Auto Theft] Unit.

---

[6] On September 22, 2016, a disposition conference was held, which has not been provided for our review

I spoke to Mr., um –

*Ms. Tu*: Beadle.[7]

*Ms. Longstreet*: -- Beadle this morning and he made an offer of eight months. And he said that he was aware of the other, um, details, but I needed to, um, speak with, uh, the sergeant and the supervisor of the Homicide Unit and have them send over a memo and we're – we'll likely work this out. That's the long and short of it.

*The Court*: Got you.

*Ms. Longstreet*: And I was going to ask the court if I – we could have a docket conference for one week from today for next Friday, and that'll give me time to do what I need to do and we'll –

*The Court*: Yeah.

*Ms. Longstreet*: -- um, be able to resolve it.

*The Court*: You can have that. I'd still like to set the other dates.

The parties then agreed to appear on October 7 for a special pretrial, on November 17 for a final conference, and on December 7 for a trial.

### b. RAY'S 2016 GUILTY PLEA TRANSCRIPT

When the parties appeared on October 7, in lieu of the potential eight-month offer contingent upon the preparation of a memo from the DPD Homicide Unit to the Prosecutor's Office, the court recognized that the parties had "worked something out." When asked what the offer was, APA Torres confirmed that Ray would plead guilty to receiving and concealing a motor vehicle, that the prosecution would dismiss the R and O, withdraw the habitual offender enhancement notice, and agree to a sentence of 24-months' probation with a GPS tether and restitution. These terms were reflected in written agreement signed by Ray. Ray's defense counsel confirmed that was her understanding and Ray affirmed that this was what he wanted to do.

The court placed Ray under oath and confirmed that Ray had signed the written plea agreement. The court then asked Ray: "Other than everything that we just talked about here in open court has anybody promised you anything else or threatened you or twisted your arm at all to get you to give up your rights and plead guilty?" Ray answered: "No, sir." And, when asked if he was pleading "freely and voluntarily," Ray answered: "Yes, sir."

Defense counsel later asked the court to place Ray on a personal bond with the tether and she also asked to approach the bench. A two-minute, unrecorded bench conference followed, and the court agreed to reduce Ray's bond to a $10,000 personal bond with a GPS tether. The court

---

[7] Beadle's role was not further explained.

-11-

noted that during the plea colloquy that Ray had denied being on probation or parole. The court then asked whether Ray "might be on probation to Judge [Gregory] Bill on something."[8] Ray recognized that he was. After confirming that there was no warrant pertaining to Ray's 2015 criminal case, Ray's attorney stated: "If there's no warrant, then there's no issue." Later, she added: "I'll let them know." The court then stated: "You know this could be a case where I – the last time we were on the record, I might have said I'll try to get the case from [Judge] Bill." Ray's attorney thought that the court "may have said something to that effect." Regardless, the court observed: "There's no warrant, so he's . . . out on bond." The court then scheduled Ray's sentencing for November 1, 2016.

## c. RAY'S 2016 SENTENCING TRANSCRIPT

On November 1, 2016, Ray's 2016 case, which was assigned to Judge Michael Hathaway, was called for a sentencing hearing, and Ray's 2015 case, which was assigned to Judge Bill, was called for a probation violation hearing. Judge Michael Hathaway began the probation violation hearing and closed "the drug case without improvement" because there was "no point in having [Ray] on two probations." The court further explained: "Judge Bill is not here today[,] and he gave me authority by virtue of his absence to deal with [Ray's 2015 case]."

Addressing the 2016 sentencing, Judge Michael Hathaway confirmed that the guidelines were correctly scored and resulted in a minimum recommended sentence of 9 to 23 months.[9] The court opined that this range was "a little high for receiving and concealing" and questioned whether it was due to Ray's prior record, which both attorneys confirmed it was. The court informed Ray it was going to sentence him "consistent with the sentence agreement" before cautioning Ray he was getting "very quickly to the point where, uh, you're not gonna get any more breaks like this. A lot of drug[] case[s], minor drug cases, theft cases." The court explained that if Ray violated his probation and it was revoked, Ray could be facing 23 months to 5 years' imprisonment.

---

[8] On October 15, 2015, Ray was charged with possession of less than 25 grams of a controlled substance, MCL 333.7403(2)(a)(*iv*), as a habitual offender. See Wayne County Circuit Court Docket No. 2015-008807-01-FH. A week later, Ray pled guilty, and the habitual offender enhancement was dismissed before then-Third Circuit Court Judge Bill. Judge Bill sentenced Ray to 18 months' probation. On December 22, 2015, a probation violation warrant was issued. On August 26, 2016, Ray was arraigned on the warrant. The violation hearing was adjourned, and, on October 12, 2016, Ray's motion to reduce bond was filed and granted.

[9] Although the sentencing guidelines are no longer mandatory, they "remain highly relevant" and the sentencing court must still consult and consider them. *People v Lockridge*, 498 Mich 358, 391; 870 NW2d 502 (2015). Under the sentencing guidelines, "[i]f the upper limit of the recommended minimum sentence exceeds 18 months and the lower limit of the recommended minimum sentence is 12 months or less, the court shall sentence the offender" to "imprisonment with a minimum term within that range" or "[t]o an intermediate sanction with or without a term of jail incarceration of not more than 12 months." MCL 769.34(4)(c)(*i*) or (*ii*). An intermediate sanction is "probation or any sanction, other than imprisonment in a county jail, state prison, or state reformatory, that may lawfully be imposed." MCL 769.31(b). See also MCL 769.31(b)(*ii*).

When the court asked whether Ray wished to say anything before his sentence was imposed, Ray thanked the judge for giving him another opportunity at probation. Ray indicated that he wanted to ask something before his attorney interjected, leading to this exchange:

> *Ms. Longstreet*: So, so, your Honor, Mr., uh, Ray, he understands what position he's in. One of the reasons, um, for the, for this were some – there were some extenuating circumstances. And if the court recalls, there were some things that, um, led to the prosecute – prosecutor showing him a huge amount of deference based on some of the –
>
> *The Court*: Yeah.
>
> *Ms. Longstreet*: -- things that he, he's done.
>
> *The Court*: Yeah.
>
> I remember. Okay.
>
> *Ms. Longstreet*: And so with that, your Honor, um, we understand you're placing him on probation. Ask the court to make it a limited time of probation.
>
> Um, in addition, there is a[n] agreement for tether. I don't think we indicated how long that tether should be.

The court remarked that it did not believe that Ray was employed, but Ray said that he was and that his job took him out of the state. When the court inquired why Ray needed to be on tether while he was on probation, APA Torres answered: "[T]hose are the, the terms. What we wanted to do is just keep track." Ray's counsel asked to approach, but Torres repeated: "For purpose of the, of the tether would just be to track" Ray. Although the court noted that the tether complicated Ray's ability to work, "[i]t was part of the plea agreement."

Ray's counsel again asked to approach the bench, leading to a four-minute, unrecorded bench conference. Afterward, the court summarized:

> All right. We had some further discussions about the tether requirement. Um, I think the, the main goal of the tether is so that the Department of Corrections can maintain, um, a location on where Mr., uh Ray is, not so much to confine him. So I'm going to impose the GPS tether. Um, no curfew until further order of the court.
>
> I think that should accomplish [sic], um, any problems that Mr. Ray may encounter with working a job.

The court explained Ray needed permission from the probation officer to leave the state, but the process would be fairly liberal so long as they knew where Ray was going and when he would return. Ray would be on the "tether for two years or until further order of the court." Numerous other probation conditions were imposed, including drug testing.

### 3. THE REMAND HEARING WITNESSES

In addition to the stipulated exhibits, five witnesses testified at the remand hearing: (1) APA Anna Posigian,[10] (2) Kristine Longstreet, (3) APA Felipe Karian-Torres, (4) Sergeant Lalone, and (5) Detective Van Raaphorst. APAs Doherty and Beadle, Davis's trial counsel, and the former judges who presided over Ray's cases were not called to testify.

### a. APA ANNA POSIGIAN

Ms. Posigian still worked for the WCPO. In 2016, she was in the Violent Crime Reduction Unit and was the APA assigned to Davis's murder case. She was involved during the grand jury proceedings that resulted in an indictment. Ray testified before the grand jury and was an eyewitness against Davis. In Posigian's view, Ray was "a very helpful witness"; however, referencing the undisputed fact that Davis's DNA (i.e., blood) was found under Stephenson's fingernails, "there would have been a possibility to prosecute the case without him . . . ."

The prosecutor's file for Davis's case was not located. Posigian had the DPD homicide file before she created the prosecutor's file. That file contained a progress note dated October 19, 2016, by Van Raaphorst reflecting that videos and statements were copied and forwarded to Posigian. In 2016, Posigian turned over discovery and additional discovery as it became available, and she would make it available to the defense attorneys either by personal delivery or having them pick it up from the office's secretaries or administrative assistants. Posigian did not recall specifically how the discovery in this case was handled, but she would not have sent it. Instead, she "would have made it available for pickup at the office or . . . would have turned it over if [she] saw them in court at a court date." Again, Posigian did not have "independent memory" of doing so; however, Posigian was "the kind of person that always turns over all discovery unless it's something that's extremely sensitive in which case [she'd] make it available for the defense attorney to view in [her] office or at the police department."

Posigian would have watched Ray's police interview before she called him to testify at the grand jury. She had not asked to watch it more recently, but did not dispute that it accurately reflected the discussion that occurred.

Posigian learned that Ray was in the Wayne County Jail before his grand jury testimony. She did not recall whether there was a probation violation or he had been charged with a new case; however, she knew he was "in jail during the grand jury testimony," but released thereafter.

Posigian initially testified she did not remember interviewing Ray in the county jail, but did not "believe" that she had. Current appellate defense counsel then presented Posigian with a note from the Homicide File reflecting that Detective Van Raaphorst had met with "APA Posigian and witness Quintell [sic] Ray discussing the case" on September 2, 2016. Posigian would meet with witnesses before "going on the record in a grand jury proceeding" and did not know whether

---

[10] Like the majority, I recognize that Ms. Posigian's married name is Merigian; however, for purposes of clarity, I will refer to her as Ms. Posigian.

September 2, 2016, was one of days before the grand jury.[11]  If so, she would assume that was what Van Raaphorst was referencing.  If not, then she did not have any recollection of meeting with the officer-in-charge and Ray.  Posigian was unaware of when the grand jury session was.  It would be extremely rare for Posigian not to talk with a witness before putting them on the stand.

Posigian did not remember Ray and the police discussing contacting the Prosecutor's Office about helping Ray with his charges.  In fact, Posigian had no independent memory of anything in Ray's video.  Regardless, Posigian testified: "The police [had] no authority to negotiate plea deals with defendants.  That's not how it works."[12]  And, even if the police told Ray they could not make any promises but would talk to the Prosecutor's Office to see if they could help him, this would not affect Ray's credibility in this case because he and Stephenson were best friends and had been so for years.  Thus, in Posigian's view, whether Ray had a low-level felony case pending or not, it would not have affected his credibility.

Posigian was not specifically aware that DPD "members were having discussions with people in [her] office regarding a plea deal for" Ray.  Posigian did not believe she discussed Ray's pending charges with anyone in the PATU.  Nor did Posigian believe that anyone from the WCPO had spoken to her about the disposition of Ray's pending charges.  Posigian believed that Ray "had an active probation violation and a new case[.]"  Posigian was further aware "that people have court dates for that[;]" however, she "was not the prosecutor assigned to his case" and she "did not involve [herself] in [Ray's other] cases."  While not sure, Posigian believed that Ray had pled guilty before Davis's trial.

Appellate counsel read Posigian's redirect of Ray into the hearing record[13] and asked whether she sought to make Ray more credible by asking those questions.  Posigian posed those

---

[11] As the majority notes, Ray testified before the grand jury on August 31, 2016.  However, the September 2, 2016 police note about a meeting with APA Posigian and Ray not only reflects that the case was discussed, but also shows that "[a]dditional search warrants [were] submitted."  Notably, during Ray's initial police interview, the officers discussed the possibility of obtaining a search warrant to locate the guns Ray had discussed with them.

[12] Prosecutors have the authority to make a decision to prosecute or to plea bargain or to enter into a sentence agreement, and the police generally lack authority to bind the prosecutor.  See *People v Killebrew*, 416 Mich 189, 199; 330 NW2d 834 (1982); *People v Gallego*, 143 Mich App 639, 641; 372 NW2d 640 (1985), aff'd *People v Gallego*, 430 Mich 443; 424 NW2d 470 (1988).  Moreover, a prosecutor is not required to offer a defendant a plea agreement.  *Weatherford v Bursey*, 429 US 545, 561; 97 S Ct 837; 51 L Ed 2d 30 (1977).

[13] *Q* [*Ms. Posigian*].  The defense attorney had asked you about being in jail and getting on a tether and everything like that.  Back in August when you were arrested, you had said there was receiving and concealing and fleeing and alluding [sic]?

*A* [*Quinetell Ray*].  Yes.

*Q*.  Did you -- what happened with that case?  Did you plead guilty –

*A*.  (Interposing) They threw one out and then just -- I plead to the other one.

-15-

questions because defense trial counsel had raised the issue. Posigian further opined: "[P]lead to one [count], dismiss the other [count]. That's a very, very standard plea." On further questioning, Posigian testified:

> Well, I asked the question so the jury would know straight from Mr. Ray himself whether there was any sort of deal to testify or not. I wasn't suggesting anything. Mr. Ray was giving a definite answer.

To Posigian's knowledge, Ray "was not receiving any credit for his cooperation." Put another way, Posigian "had no knowledge of any consideration given to Quin[e]tell Ray in exchange for his testimony in [Davis's] case[.]"

After Davis's trial and sentencing concluded, Ray contacted Posigian about concerns for his safety. Specifically, Ray was receiving threats and wondered whether Posigian could assist him in having his probation transferred or talk to someone about having his probation transferred[14] to another state.[15] Posigian contacted Ray's probation agent to share "that there was a very long history of witness intimidation and retaliation by [Davis] and his friends and family against the witnesses in this case." Later, Posigian clarified that she did not believe there was any direct contact from Davis, who was in jail, to Ray; however, Davis's friends and family members contacted witnesses. For example, Posigian believed that Stephenson's mother's "house was shot up during trial." And, while Ray was testifying, people went to his girlfriend's house. In Posigian's opinion, "[t]here was a lot of intimidation and interference going on from the defense

---

*Q.* Okay. So you -- you pled guilty?

*A.* Yeah.

*Q.* Okay. And you took a plea deal?

*A.* Yeah.

*Q.* Okay. Was your testimony in this case at all –

*A.* (Interposing) No.

*Q.* -- contemplated in that plea deal?

*A.* No.

*Q.* Are you getting off the tether tomorrow because you testified today?

*A.* No.

[14] Posigian did not recall Ray asking for his probation to be closed out. "He just wanted it transferred to another State."

[15] Posigian understood that before Michigan could transfer probation to another state, the other jurisdiction had to accept it.

side." Also, while Posigian did not recall this, she determined she appeared at Ray's probation hearing, which she believed occurred in 2017.[16]

### b. DEFENSE COUNSEL KRISTINE LONGSTREET

In 2016, Longstreet worked as a public defender for the State Defender Office. Although Longstreet had reviewed the transcripts from Ray's 2016 case, Ray's name "[b]arely" rang a bell and the transcripts did not refresh her recollection. Moreover, Longstreet could not secure the file from Ray's 2016 case after the Neighborhood Defender Service was granted the contract to represent indigent criminal defendants in lieu of the State Defender Office.

During Ray's 2016 calendar conference, Ms. Longstreet said:

I spoke to Mr. * * * Beadle this morning and he made an offer of eight months. And he said that he was aware of the other, um, details, but I needed to, um, speak with, uh, the sergeant and the supervisor [for] the Homicide Unit and have them send over a memo and we're – we'll likely work this out. That's the long and short of it.

Asked what details she was referring to, Longstreet answered: "I would assume the details of the offer[.]" The prosecutor objected to this assumption, especially given Longstreet's lack of memory and the admission of the transcripts themselves. But the court overruled the objection, giving appellate defense counsel leeway. The following exchange occurred:

*Q* [*Appellate defense counsel*]. Would the details that you've referred to in the calendar conference, wasn't that Mr. Ray's cooperation in the homicide case of People v Davis? Aren't those the details?

*A* [*Ms. Longstreet*]. I would assume so –

*Q.* Okay.

*A.* – based on reading the transcript.

*Q.* Okay.

Were you aware at the time of your representation of Mr. Ray that Mr. Ray was cooperating with the Homicide Section in the case of People v Davis? Yes or no if you can answer it that way.

*A.* I don't think I can answer it yes or no, but based on reading the transcript it appears that there was some cooperation.

---

[16] No transcript of this hearing was provided. But the docket entries from Ray's 2016 case reflect that a review hearing was held on Ray's probation on April 26, 2017. That same day, the court ordered Ray's probation be closed "with improvement" and his tether be removed.

Turning to the plea transcript, appellate defense counsel asked what led to the plea offer of eight months evolving to a probationary period within a week. Longstreet had no "independent recollection of what happened in the week between the time Mr. Ray appeared and the actual plea." Longstreet did not recall any conversations she had with the WCPO's PATU or the Homicide Unit during that week. Longstreet did not recall seeing a letter or any communication from Homicide or the PATU pertaining to Davis.

Turning to Ray's 2016 sentencing transcript, appellate defense counsel asked Longstreet what she meant by "the huge" "deference based on some of the things that Mr. Ray has done[.]" Longstreet eventually responded:

> That Mr. Ray was cooperating in some shape, form or fashion. I would not know or have any memory of what case or the name of the individual Mr. Ray was offering cooperation for.

But, if the transcripts reflected Longstreet had referenced a homicide prosecution involving Posigian, Longstreet would agree she said that.

### c. APA FELIPE BARBOSA KARIAN-TORRES

Although Felipe Karian-Torres left the WCPO in 2022, he was technically assigned to PATU in 2016. Karian-Torres did not recall Ray's 2016 case, but he had reviewed the transcripts provided by appellate defense counsel. Karian-Torres was not present for the calendar conference but placed the agreement on the record at the time of the plea. Karian-Torres did not recall a prior negotiation with APA Beadle. Karian-Torres did not recall engaging with anyone in the Prosecutor's Office about a plea agreement with Ray in exchange for his cooperation. Karian-Torres did not recall any conversation with any APA about whether Ray was cooperating. Karian-Torres would be speculating as to why the initial eight-month sentence offered was reduced to probation.

Mr. Dennis Doherty was the head of PATU at the time Ray's plea occurred. Karian-Torres did not recall having any discussions with Doherty about Ray before entering the offer on Ray's plea date. Karian-Torres explained that if an offer had been made and there was a reason that he wanted to change it, he would have talked to Doherty. Moreover, if someone else wanted to change it, like Doherty, he might have come to talk to Karian-Torres. Further, sometimes things would change if Doherty had given Karian-Torres barriers when the case came to him. Doherty might have explained what the initial offer was and that this is what he would allow Karian-Torres to do.

At Ray's sentencing, Karian-Torres did not know what Longstreet was referring to when she said that the prosecutor showed a "huge amount of deference" to Ray for "things he's done." Karian-Torres did not recall having any subsequent conversation with Posigian. In fact, he did not recall ever speaking with Posigian after Ray's plea or sentence about what had occurred. He was certain he had talked to Posigian in the intervening years; however, he did not recall speaking to her about Ray's PATU case.

## d. SERGEANT ROBERT LALONE

Lalone testified that he had watched Ray's 2016 video interview. Lalone remembered Davis's case; however, Van Raaphorst was the officer-in-charge. Ray was in custody for receiving and concealing a vehicle and R and O. The purpose of interviewing Ray was to see whether he would provide truthful testimony about the shooting because he was an eyewitness.

Lalone did not dispute the statements on the video. Throughout, Ray expressed concern for his and his family's safety and there was discussion about protecting them, including moving them. Ray also said that the car was not stolen, and Ray was more worried about his safety than his criminal charges. Lalone never made any promises to Ray. Lalone specifically told Ray he could not promise him anything because doing so was "far beyond [his] control." Further, while Lalone had regular dealings with Posigian and assumed that he had dealings with her possibly in Davis's case, he did not recall directly addressing a plea for Ray with her.

Either on the day of Ray's interview or within the following days, Lalone and Van Raaphorst went to the WCPO and met with Doherty, the head of PATU. Lalone explained that Ray was a witness to a homicide and he had a stolen car case. Lalone never asked Doherty to dismiss Ray's case because he was cooperating. Lalone asked Doherty "to track the case and if there's anything he could do for him [they'd] appreciate it [be]cause [Ray] was helping [them] out and he's cooperating." Lalone testified that he did not ask Doherty to give Ray a plea deal. But Lalone also testified that he asked Doherty if there was something that the prosecutor's office could do for Ray, "depending on a plea agreement that would compel him to cooperate [be]cause [Ray] was very hesitant." Given Ray's fear, they had to have "something hanging over his head to get him on the stand or get him to cooperate with [them;] he didn't have anything compelling him to come in and testify." Lalone's intention was to ask "Doherty to give [Ray] some sort of break in his pending charges[.]" Doherty said "that he assumed the case [and] that he was going to look at and see, he had to talk to the defense attorney, . . . and find out what they were going to do with the case, but that was the last" brief conversation they had. "It wasn't anything in depth." To Lalone's recollection, Doherty said that "it was just a stolen car case," and there were no further meetings. After that initial meeting, "that's the last [Lalone]" heard of it. Lalone did not recall ever talking to Ray after his follow-up conversation with Doherty and did not know if anyone else had.

To Lalone's knowledge, Ray's 2016 interview "would have been uploaded [and] taken to the Prosecutor's Office for discovery" because "[e]verything's turned over to them." Typically, the police would make a video disk and put the original into evidence. "[E]verything was turned over to the prosecutor and the defense at the time." They "used to even burn disks for the discovery for the defense." Lalone, however, did not have personal knowledge of the video being turned over to the defense in Davis's case.

## e. DETECTIVE MATTHEW VAN RAAPHORST

Van Raaphorst was the officer in charge of Davis's case. He was present throughout the trial with APA Posigian.

Before trial, Van Raaphorst's investigation led him to believe Ray was a potential eyewitness. Van Raaphorst had watched Ray's interview and testified it was accurate. Neither Lalone nor Van Raaphorst explicitly promised Ray anything to get him to cooperate. In fact, they told Ray "quite a few times that [they] couldn't promise him anything and [that they] didn't have the authority to make any deals."

Van Raaphorst also recalled going to the WCPO with Lalone and speaking to Doherty. Lalone contacted Doherty because Van Raaphorst did not really know him. Lalone let Doherty know Ray "was cooperating with a homicide investigation." One of the officers also let Doherty know Ray had a pending PATU case. Van Raaphorst did not ask Doherty to dismiss Ray's pending criminal charges or for leniency pertaining to those charges. Neither officer asked Doherty whether the Prosecutor's Office could help resolve Ray's PATU case because he was "being cooperative in a homicide investigation." Rather, "[i]t was just relayed to [Doherty] that [] Ray was under arrest for possession of a stolen motor vehicle" "and that Ray was cooperating in a homicide investigation." At that point, "[i]f the prosecutor wanted to consider something like that, that would have been on them." Moreover, Van Raaphorst testified that he did not "know of any special consideration that was given to [] Ray in exchange for him cooperating."

After Ray's interview, Van Raaphorst did not remember meeting with APA Posigian. Again, he was "not saying it didn't happen," he just did not remember doing so. Even so, the Homicide Unit's file reflected that there was a September 2, 2016 meeting involving Van Raaphorst, APA Posigian, and Ray "discussing [the] case," and that "[a]dditional search warrants [were] submitted."

There was also a police progress report dated October 19, 2016, stating: "Videos and statements copied and forwarded to APA Posigian[.]" Van Raaphorst did not specifically recall whether Ray's videotaped interview was provided to APA Posigian. Nor could Van Raaphorst recall watching the interview with Posigian. Van Raaphorst was aware that Ray was "a cooperating witness" and that he "was basically the key witness insofar as eyewitness identification[.]"

Van Raaphorst did not remember any discussions with APA Posigian and Ray about Ray's pending receiving and concealing charge. Van Raaphorst further did not recall relaying to APA Posigian that the police went to PATU and had discussions; however, he also did not see why he would not have done so. On the other hand, Van Raaphorst did recall several conversations with APA Posigian and "possibly Ray over the concern for [Ray's] safety while testifying." Van Raaphorst thought that APA Posigian was helping Ray "find a new home that he and his family could stay in during the trial."

## C. THE TRIAL COURT'S RULING ON REMAND

On February 25, 2025, Judge Nicholas Hathaway issued a written opinion and order denying Davis's motion for relief from judgment. The court determined that Davis had not proven "Ray received a favorable plea agreement in exchange for his testimony in this case." In so holding, the court explained that "Ray's plea form and plea hearing transcript reflect that there were no other promises made or terms to fulfill." And "[n]one of the witnesses testified to the contrary or disclosed any secret deals." Moreover, Davis's "trial counsel was well aware of Ray's

plea and sentence agreement at the time of trial and cross-examined Ray regarding [its] details in front of the jury." The court also determined that Davis had not established "good cause for failing to raise these grounds on appeal and actual prejudice from the alleged irregularities have not been established." Additionally, Davis had not "shown that [] Ray committed perjury or that he made a willfully false statement." Nor had it "been shown that the prosecution suppressed evidence, favorable to the defense, that was material to the case." And even assuming that "anything . . . adduced at the evidentiary hearing had been previously undisclosed at trial, a *Brady* [*v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963),] violation ha[d] not been shown." Davis had not established a reasonable probability of a different outcome. The evidence against Davis was strong, Ray's testimony remained consistent, and "[t]here was other corroborating evidence." "Ray was impeached by the fact that he received probation for his felony charges, and any "[f]urther impeachment of Ray regarding a speculative undisclosed agreement would not have made a different result probable."

## II. STANDARDS OF REVIEW

This Court reviews for an abuse of discretion a trial court's ruling on a motion for relief from judgment. *People v Washington*, 508 Mich 107, 130 n 9; 972 NW2d 767 (2021). An abuse of discretion occurs when a trial court's decision falls outside the principled range of outcomes. *People v Swain*, 288 Mich App 609, 628-629; 794 NW2d 92 (2010). On the other hand, this Court reviews for clear error a trial court's finding of fact. *Id*. at 628. A finding is clearly erroneous when we are left with the definite and firm conviction that a mistake has been made. *People v Byars*, 346 Mich App 554, 562; 13 NW3d 328 (2023). "Resolution of facts about which there is conflicting testimony is a decision to be made initially by the trial court." *People v Farrow*, 461 Mich 202, 209; 600 NW2d 634 (1999). "The trial judge's resolution of a factual issue is entitled to deference." *Id*. "This is particularly true where a factual issue involves the credibility of witnesses whose testimony is in conflict." *Id*. Indeed, we defer to a trial court's credibility determinations because it has the opportunity to hear and observe the witnesses' demeanor as they testify. *People v Tate*, 134 Mich App 682, 688; 352 NW2d 297 (1984). See also MCR 2.613(C) ("[R]egard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.").

## III. ANALYSIS

## A. LEGAL PRINCIPLES

Davis bears the burden of establishing entitlement to relief under MCR 6.508(D). *People v Christian*, 510 Mich 52, 75; 987 NW2d 29 (2022). A defendant may not raise grounds for relief, except for jurisdictional defects, that could have been raised on direct appeal or in a prior motion for relief from judgment unless he demonstrates good cause for failing to previously assert such grounds on appeal or in a prior motion. MCR 6.508(D)(3)(a). A defendant may establish good cause by proving that he received ineffective assistance of appellate counsel. *People v Spears*, 346 Mich App 494, 504 n 3; 13 NW3d 20 (2023). To do so, a defendant must "show that appellate counsel's performance fell below an objective standard of reasonableness and was constitutionally deficient." *People v Reed*, 449 Mich 375, 390; 535 NW2d 496 (1995). A defendant may demonstrate good cause "by showing that some external factor prevented counsel from previously

-21-

raising the issue," including the prosecution suppressing evidence that prevented appellate counsel from raising a *Brady* violation on direct appeal. *Id*. at 378; *Christian*, 510 Mich at 81.

"Once a defendant demonstrates good cause, a new trial is only warranted if they also show 'actual prejudice from the alleged irregularities that support the claim for relief.' " *Christian*, 510 Mich at 75, quoting MCR 6.508(D)(3)(b). The defendant may establish actual prejudice by demonstrating, "but for the alleged error, the defendant would have had a reasonably likely chance of acquittal[.]" MCR 6.508(D)(3)(b)(i)(A). "Alternatively, a defendant can show actual prejudice where there is an 'irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case[.]' " *Christian*, 510 Mich at 75, quoting MCR 6.508(D)(3)(b)(iii).

## B. APPLICATION

Davis argues that Posigian failed to inform defense counsel about a plea and sentence agreement between the prosecutor's office and Ray in exchange for Ray's testimony in Davis's case.[17] Specifically, Davis contends that Posigian's failure to advise Davis's trial counsel of the agreement violated both MCR 6.201(B)(5) and *Brady*.

### 1. MCR 6.201(B)(5)

MCR 6.201(B)(5) reads:

Upon request, the prosecuting attorney must provide each defendant:

\* \* \*

(5) any plea agreement, grant of immunity, or other agreement for testimony in connection with the case.

Neither the docket entries nor court file provided to this Court include a written defense discovery request. During Davis's arraignment on the grand jury indictment, the parties agreed to entry of a protective order that prohibited the disclosure of information obtained in this case by the parties or their investigators to third parties. Evidence introduced during the remand hearing confirmed that videos and police reports were sent to APA Posigian on October 19, 2016. The record also reflects that Davis's family retained an attorney for him to replace his court-appointed counsel one month before the initially scheduled trial date in January 2017. At the final conference before that trial date, APA Posigian informed the trial court that Davis's court-appointed counsel had "tendered discovery to defense counsel,"[18] but she and newly retained counsel were meeting

---

[17] Recognizing the seriousness of the underlying matter involved, Davis's current attorney condenses his argument to the colloquial expression: "If it walks like a duck, swims like a duck, and quacks like a duck, then it is probably a duck."

[18] Curiously, this was done in violation of the protective order, which provided that no discovery material obtained from the prosecution could be given to substitute counsel, and, instead, all

in three days "to make sure he has everything that I have." Davis's trial was later adjourned to March 2017.

During trial, Van Raaphorst testified that he learned from on-scene witnesses that Stephenson "may have been hanging out with . . . Q." Van Raaphorst "took an educated guess" that "Q" might be Quinetell Ray. Van Raaphorst was notified that Ray was in custody for possession of a stolen motor vehicle. Van Raaphorst interviewed Davis on August 17, 2016. That interview was recorded and placed onto a disk.

Davis's retained counsel did not express surprise over Van Raaphorst's trial testimony or object that he had not been provided with the disk. Despite Davis's appellate attorney's contention that Ray's video-recorded police interview was not provided to him until the hearing on remand, the trial court determined that what occurred during trial demonstrated that Davis's trial counsel had the disk. I cannot conclude that this finding was clearly erroneous.

Further, the terms of Ray's plea agreement were set forth in writing and did not include testifying for the prosecution. Ray, who was under oath at the time he pled, confirmed that nothing else had been promised to him to secure his plea, and Ms. Longstreet, his court-appointed attorney for the 2016 criminal case, also confirmed the terms of Ray's written agreement on the record. Thereafter, Ray testified at Davis's trial that Ray had pled guilty to one criminal charge in exchange for dismissal of another. And Ray confirmed that his testimony in Davis's case was not contemplated in his plea deal.

Nor is there any dispute that Davis's trial counsel was well aware that Ray pled guilty in his 2016 case and that Ray's 2015 case had been dismissed because he inquired about both cases when he cross-examined Ray. Despite Davis's speculative accusations about a "secret" agreement, I cannot conclude that the trial court clearly erred when it determined that no agreement existed for Ray's testimony at Davis's trial. Throughout Ray's interview, the police made plain that they could not make any agreement with Ray; instead, it was the prosecutors alone who could make an agreement. Ray, who had experience with the law enforcement, repeatedly recognized the same. Moreover, the potential agreement Ray's plea-taking counsel discussed with APA Beadle, which required counsel to secure a memo from DPD's Homicide Unit, never materialized. Instead, Ray and the prosecution reached a new agreement—one that was typical for PATU, dismissal of one charge in exchange for a plea to another. That agreement did not require Ray to testify at Davis's trial. In fact, whether Ray testified at Davis's trial or whether Ray declined to do so, Ray retained the benefit of his plea bargain.

## 2. *BRADY*

Prosecutors are obligated to turn over exculpatory evidence, even if defense counsel does not ask for it when suppression of it would be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v Agurs*, 427 US 97, 108; 96 S Ct 2392; 49 L Ed 2d 342 (1976). To establish a *Brady* violation, a defendant must show: "(1) the prosecution

---

discovery obtained from the prosecution had to be returned within one week of the substitution of counsel.

has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id*. When a witness's reliability may be determinative of guilt or innocence, the nondisclosure of evidence affecting the witness's credibility falls within the scope of *Brady*. *Chenault*, 495 Mich at 150. "To establish materiality, a defendant must show that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.' " *Id*., quoting *United States v Bagley*, 473 US 667, 682; 105 S Ct 3375; 87 L Ed 2d 481 (1985). This standard does not require the defendant to demonstrate "that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id*. (quotation marks and citation omitted). Rather, "[t]he question is whether, in the absence of the suppressed evidence, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. at 150-151 (quotation marks and citation omitted).

There is an affirmative duty on prosecutors to become aware of and to disclose any favorable evidence held by others acting on their behalf, including the police, in the case. *Kyles v Whitley*, 514 US 419, 437; 115 S Ct 1555; 131 L Ed 2d 490 (1995); *Chenault*, 495 Mich at 150 ("The government is held responsible for evidence within its control[.]"). Moreover, the *Brady* obligation extends to all prosecutors in the office. See *United States v Giglio*, 405 US 150, 154; 92 S Ct 763; 31 L Ed 2d 104 (1972). *Brady* even applies to "evidence unknown to the prosecution," and "without regard to the prosecution's good or bad faith[.]" *Chenault*, 495 Mich at 150. In other words, "[i]f suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *Agurs*, 427 US at 110.

In *Giglio*, a witness, who was an uncharged, unindicted coconspirator, testified that no one had promised him that he would not be prosecuted for his criminal activities. *Giglio*, 405 US at 151-152. Consistent with the witness' testimony, in closing argument, trial prosecutor argued that the witness had not been promised that he would not be indicted. *Id*. at 152. After the petitioner was convicted, the prosecutor involved in the earlier grand jury proceedings filed an affidavit averring that he had promised the witness that he would not be indicted if he testified before the grand jury and at trial. *Id*. In response, the trial prosecutor filed an affidavit asserting that the initial prosecutor "assured him before the trial that no promises of immunity had been made to" the witness.[19] *Id*. The federal district court did not resolve the conflict but determined that the initial prosecutor "was not authorized" to make such a promise and disclosing it would not have affected the jury's verdict. *Id*. at 153. The United States Supreme Court reversed, noting that

---

[19] A third prosecutor filed an affidavit, averring that he had personally consulted with the witness and his attorney "shortly before trial to emphasize" that the witness would be prosecuted if he did not testify, but, if he did testify, he would be relying on the government to decide whether he would be prosecuted. *Giglio*, 405 US at 153. The Court noted that this "affidavit, standing alone, contain[ed] at least an implication that the Government would reward the cooperation of the witness, and hence tend[ed] to confirm rather than refute the existence of some understanding for leniency." *Id*. n 4.

neither the initial prosecutor's authority nor his failure to inform his superiors or his associates was controlling. *Id*. at 154. It reasoned:

> [W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government. See Restatement (Second) of Agency s 272. See also American Bar Association, Project on Standards for Criminal Justice, Discovery and Procedure Before Trial s 2.1(d). To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it. [*Id*.]

Moreover, because the prosecution's case in *Giglio* depended "almost entirely" on the witness's testimony, his credibility was "an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." *Id*. at 155. For these reasons, the Supreme Court decided that a new trial was required. *Id*.

In my view, there was no written agreement for Ray's testimony in Davis's case. But the Sixth Circuit Court of Appeals has held that "*Brady* is not limited to formal plea bargains, immunity deals or other notarized commitments." *Harris v Lafler*, 553 F3d 1028, 1034 (CA 6, 2009). Rather, "[i]t applies to less formal, unwritten or tacit agreements, so long as the prosecution offers the witness a benefit in exchange for his cooperation, so long . . . as the evidence is favorable to the accused." *Id*. (citations omitted). Another court, however, has recognized that while defendants are entitled to discovery of a final plea agreement with and proffer letter to cooperating codefendants or witnesses, they are not entitled to earlier drafts. See *United States v Miller*, 250 FRD 588, 592-593 (D Kan, 2008) ("Nor is there an obligation under *Brady* or *Giglio*, to disclose all drafts or versions of plea agreements, proffer letters or grants of immunity. To the extent [the] defendants seek such, their motion is denied because they are entitled onto only the final, operative plea agreement, proffer letter, or immunity agreement."). See also *United States v Santisteban*, 501 F3d 873, 880 (CA 8, 2007) ("Because the final plea agreement superseded the antecedent proffer letters," "the government satisfied its obligations under the Due Process Clause by providing [the witness'] plea agreement to [the defendant].").

Given the record below, I cannot conclude that the trial court erred when it determined that Davis failed to establish that there was a plea deal for Ray to testify against Davis. To the extent that there was a discussion of an offer and the need to have the DPD Homicide Unit provide a memo, there was no evidence that Longstreet secured that memo. Instead, a new bargain was made without a requirement that Ray testify at Davis's trial.

In support of its conclusion otherwise, the majority points to Ray's release on a personal bond with the tether and an unrecorded bench conference to establish that Ray made a deal to testify against Davis in exchange for Ray's plea. But Ray's release was a consequence of the terms of the written plea agreement. Moreover, because Ray had previously left the state while on probation, placing him on a tether was undoubtedly an appropriate condition of his probation. See

MCL 771.3(3) (A "court may impose lawful conditions of probation as the circumstances of the case require or warrant or as in its judgment are proper.").

The majority further deduces that Ray's early discharge from his two-year probationary sentence was indicative of Ray having made a deal to testify against Davis. Yet, the undisputed testimony at the remand hearing demonstrates that Ray sought to have his probation transferred to another state because of threats arising from his trial testimony against Davis.[20] During the remand hearing, Posigian testified that she contacted Ray's probation officer. And the docket entries from Ray's 2016 case reflect that counsel was appointed for Ray, that the court held a hearing, and that the court closed Ray's probation with improvement and removed his tether. While the majority emphasizes that Ray served less than six months of his probationary period, it ignores that MCL 771.2(3) and (5) permit early discharge in the court's discretion.[21]

Finally, the majority calls into question Posigian's awareness of Ray's deal, pointing to her testimony about the September 2, 2016 meeting with Van Raaphorst and Ray. Frankly, it is hardly shocking that the witnesses who testified about Ray's low-level felonies at the 2025 remand hearing did not recall much of what happened in 2016 and 2017 given the high volume of criminal cases processed in Wayne County. It is true that Posigian was uncertain about when Ray testified before the grand jury and that she typically met with witnesses for that purpose. As the majority recognizes, Ray testified before the grand jury on August 31, 2016; however, what the majority ignores is that after the notation memorializing that meeting are the words: "Additional search warrants submitted." And, notably, during Ray's interview, he discussed the possible location of several firearms, including the one used to inflict Stephenson's fatal wound. That notation thus provides a logical explanation for Ray's meeting with Posigian and Van Raaphorst, the officer-in-charge of Davis's case.

In sum, none of the majority's reasons, alone or together, establish that a "secret deal" was made for Ray's testimony.[22] Nor can one deduce that the witnesses who testified at the remand hearing, including Posigian, intentionally lied when they testified that Ray's plea agreement did

---

[20] Again, Davis did not provide a transcript of Ray's April 26, 2017 hearing, during which the court discharged Ray from probation with improvement.

[21] MCL 771.2(2) also permits a probationer to be discharged after completing one-half of his original probationary period, which in Ray's case would have been one year.

[22] Although testimony from APAs Doherty or Beadle or Judge Michael Hathaway may have potentially shed further light on the terms of the plea agreement, Davis did not call them.

As for the subsequent stipulated fact that in Posigian's closing argument she argued that Ray received no plea deal at all in his 2016 case, the trial testimony plainly showed that Ray did not plead as charged. Instead, Ray's testimony was clear that one charge (albeit a fleeing and eluding rather than a resisting and obstructing) was dismissed, that the habitual offender enhancement was dismissed, that Ray was sentenced to a probationary term, and that Ray's probation for his 2015 was closed. Because the prosecutor's argument are not evidence, *People v Loew*, 340 Mich App 100, 127; 985 NW2d 255 (2022), I do not place the weight on the parties' stipulation that the majority does.

-26-

not require Ray to testify during Davis's trial. To put it in appellate counsel's terms, what walks like a duck, swims like a duck, and quacks like a duck, is probably a duck, unless it's a platypus. Here, the trial court had not only the opportunity to hear the witnesses testify but also had the opportunity to observe their demeanor. Because the trial court was in the best position to evaluate their credibility, I cannot conclude that the trial court clearly erred when it determined there was no secret deal for Ray's testimony at Davis's trial.

Even so, Davis demonstrated his plea agreement in the PATU case was a reward for Ray's prior cooperation in Davis's case. At Ray's sentencing, Longstreet detailed why this particular leniency was extended to Ray: "One of the reasons, um, for the, for this were some – there were some extenuating circumstances. And if the court recalls, there were some things that, um, led to the . . . prosecutor showing [Ray] a huge amount of deference based on some of the * * * things that he, he's done." Ray's sentencing court confirmed that it did recall Ray being afforded leniency based on his prior actions. Moreover, APA Karian-Torres, who was present during Ray's plea, did not contradict Longstreet's explanation. Thus, despite other testimony that the dismissal of one charge in exchange for a plea to another in PATU cases was typical, Longstreet's contemporaneous explanation about Ray's particular plea deal suggests that it would not have been extended to Ray absent Sergeant Lalone's explanation of Ray's earlier cooperation to Doherty, PATU's head.

Evidence that the prosecution actually rewarded Ray for his prior cooperation against Davis was impeaching. *Chenault*, 495 Mich at 150. Thus, the next question is whether Davis established materiality by showing that " 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.' " *Id*., quoting *Bagley*, 473 US at 682. "The question is whether, in the absence of the suppressed evidence, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. at 150-151 (quotation marks and citation omitted).

In this case, Davis's police interview was played for the jury and Davis certainly admitted he had strong motive to harm Stephenson; however, Davis also identified others who had reason to harm Stephenson. And Davis repeatedly denied any connection with the phone number before recognizing it as a work/street phone that he shared with others. But the phone's contents, including messages with the username of MyroD, established a connection to Davis. Even so, Davis explicitly denied possessing the phone that night, and Martin vacillated between calling that number and speaking to Davis or to Davis's drug runner. Moreover, Davis admitted that people contacted that phone, which Davis claimed to be in the possession of his companion that evening, to report that Davis had killed Stephenson. Furthermore, there is no dispute that one of Martin's texts read: "Dog out here"; however, Martin claimed that he was referring to himself. And, in any event, an expert testified that that phone was in the location of the murder and that it was "highly, highly improbable . . . on the outskirts[] that it would never happen" that the phone was not at the location Davis claimed to be on the night of Stephenson's murder.

Nevertheless, Ray was the sole eyewitness to identify Davis as the shooter, despite several other witnesses being present in the park and surrounding area. Further, Ray testified that he "might have told" a couple of people that he had not seen anything the night of the shooting.

The prosecution, however, points to the fact that Davis's blood was found under Stephenson's fingernails as powerful evidence of Davis's involvement. But Martin testified that he had seen Davis and Stephenson together at 11 a.m. or 12 p.m. that day and surmised that they were in an altercation because "they were out of breath and sweaty." Ray, on the other hand, maintained that he and Stephenson had spent the day together and had not seen Davis. Likewise, during Davis's interview, Davis denied interacting with Stephenson outside of their limited telephone contact. Yet, Davis also mentioned that his girlfriend stayed around the corner from Stephenson. Davis further described leaving his girlfriend's house on the day of the shooting at 2:00 p.m. before going elsewhere.

Additionally, after the shooting, Martin heard a woman say: "Tyrone shouldn't [have] did that."[23] And Deborah Broogerdi, who lived on Cherrylawn, testified at Davis's trial that she heard someone screaming: "[N]o Tyrone. No Tyrone or stop Tyrone or something like Tyrone." Calvin Kendricks, another witness, also told the police that he heard someone saying "Tyrone, you didn't have to shoot him." At trial, however, Kendricks said he was not certain about the name he had heard. But anonymous calls to Crime Stoppers also named "Tyrone Davis" as the shooter, even though other witnesses testified that they did not know a Tyrone who lived in the area. In following up on the name Tyrone, Van Raaphorst, the officer in charge, testified nothing further developed. Finally, the other witnesses to the shooting were consistent that the shooter was a black male, generally dressed in black or dark-colored clothing; however, they differed about other identifiers, including age and hair type, even though then 39-year-old Davis was bald.

Given the numerous conflicts in the trial testimony, Ray's eyewitness testimony identifying Davis as Stephenson's killer was critical. Therefore, although the jury heard about Ray's plea deal, I cannot conclude that Davis received a fair trial in the absence of undisclosed impeachment evidence that Ray's favorable plea deal resulted from Ray's prior cooperation in Davis's case.[24]

### 3. GOOD CAUSE AND PREJUDICE

In my opinion, Ray met his burden of establishing good cause for failing to raise the issue related to the benefit Ray received either because of the *Brady* violation or ineffective assistance of Davis's initial appellate counsel for failing to investigate whether the police had followed through on talking to PATU's head to see what could be done about Ray's pending criminal charges in light of Ray's cooperation in Davis's case. *Christian*, 510 Mich at 81; *Reed*, 449 Mich at 390; *Spears*, 346 Mich App at 504 n 3. As discussed by the majority, Davis's initial appellate counsel suspected Ray had benefited from his cooperation in this case; however, he failed to investigate and properly present the issue for this Court's review. Moreover, both Davis's trial counsel and initial court-appointed appellate counsel, who were aware of Ray's recorded interview, speculated that Ray had benefited from his testimony against Davis, but neither further

---

[23] Ray testified that that night Stephenson "kept saying": "Myron don't. Myron don't. Please don't."

[24] In fact, during closing argument, Davis's trial attorney speculated that Ray had received a deal.

investigated the subsequent police or prosecutorial action taken. For these reasons, I agree with the majority that Davis established good cause under MCR 6.508(D)(3)(a).

Turning to the issue of whether Davis established actual prejudice, he could do so either by showing that "but for the alleged error, [he] would have had a reasonably likely chance of acquittal," MCR 6.508(D)(3)(b)(i)(A), or "the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case,' " MCR 6.508(D)(3)(b)(iii). Our Supreme Court described the standard for establishing actual prejudice under *Brady* (" 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,' ") as being "strikingly similar" to the actual prejudice standard under MCR 6.508(D)(3)(b)(i)(A) ("but for the alleged error, the defendant would have had a reasonably likely chance of acquittal[.]" *Christian*, 510 Mich at 90, quoting *Chenault*, 495 Mich at 150, quoting *Bagley*, 473 US at 682, and quoting MCR 6.508(D)(3)(b)(i)(A). And, for the reasons already discussed, I agree that defendant has also established actual prejudice. Accordingly, defendant has established that he is entitled to relief from judgment and a new trial.[25]

/s/ Anica Letica

---

[25] I would not address the issue of whether Posigian knew or should have known that she presented perjured testimony, *Agurs*, 427 US at 103-104, because it is unnecessary to do so. If I were to address it, I disagree with the majority's premise that Ray had a secret plea deal to testify against Davis. And while it appears curious that neither Posigian nor Davis's trial counsel, who possessed Ray's recorded interview, followed up with Lalone and Van Raaphorst about their subsequent actions, as also discussed during Ray's interview, it would not be the first time police officers made statements about future action they would undertake but failed to perform. Significantly, the police did not promise Ray that his 2016 charges would be dismissed or reduced because only the prosecutor had the legal authority to do so. At best, the evidentiary hearing testimony reflected that Van Raaphorst did not see why he would not have informed Posigian of the subsequent police action, but not that he actually did so. Likewise, Lalone did not recall directly addressing a plea for Ray with Posigian. Nor did APA Karian-Torres recall speaking with Posigian after Ray's plea or sentence about what had occurred. Finally, Posigian herself denied being aware of the progress of Ray's unrelated felony cases. On this record, especially given the trial court's superior position to assess the credibility of witnesses who testified before it, I conclude that the trial court did not clearly err in determining that Posigian did not knowingly present perjured testimony when Ray denied that his testimony at Davis's trial was not contemplated as part of "that plea deal."